**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Christine M. Arguello**

Civil Action No. 22-cv-00841-CMA-MEH

ROBERT DAYTON,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
PAUL PAZEN, Chief of Police, in his individual capacity;
PATRICK PHELAN, Commander, in his individual capacity;
JOHN DOES 1-4, in their individual capacities,

      Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

---

This matter is before the Court on two motions to dismiss: one brought by Defendant City and County of Denver ("Denver") (Doc. # 12), and one brought by Defendants Paul Pazen and Patrick Phelan (Doc. # 13) (collectively, "Motions to Dismiss"). For the following reasons, the Motions to Dismiss are granted in part and denied in part.

## I.    <u>BACKGROUND</u>

The following well-pleaded facts are taken from Plaintiff Robert Dayton's Complaint (Doc. # 1) and are assumed to be true for purposes of reviewing the Motions to Dismiss. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Following the murder of George Floyd by Minneapolis police on May 25, 2020, thousands of people began protesting in the city of Denver. (Doc. # 1 at ¶¶ 12, 16.) After the protests began, Denver invoked Colorado's Mutual Aid Statute, calling for other agencies from across the Denver metro area to respond to the protests. (*Id.* at ¶ 20.) The mutual aid agencies were operating under Denver's control on May 31, 2020. (*Id.*)

On the evening of May 31, 2020, Mr. Dayton left his home in the Capitol Hill neighborhood of Denver to observe the protests. (*Id.* at ¶ 21–22.) When Mr. Dayton arrived at the protests on Colfax Avenue, he saw that Denver Police Department ("DPD") officers "were aggressively advancing on the protesters and indiscriminately shooting at them with Kinetic Impact Projectiles ("KIPs"), including 40mm rounds and pepper balls." (*Id.* at ¶ 23.) Mr. Dayton did not observe the protesters engaging in any unlawful behavior, property destruction, or aggression against the police. (*Id.*) He was shocked to see officers using force against peaceful protesters and decided to join the protesters "to express his belief that this violent reaction by the police was wrong." (*Id.*)

After Mr. Dayton joined the crowd of protesters, DPD officers continued to indiscriminately shoot pepper balls and other KIPs into the crowd. (*Id.* at ¶ 24.) Near the intersection of Colfax Avenue and Emerson Street, Mr. Dayton was hit multiple times by pepper balls shot by Defendants John Does 1-4. (*Id.*) Mr. Dayton alleges that when he was shot with pepper balls, he was peacefully protesting: He was not engaging in any property destruction, committing any crime, threatening any law enforcement officers or other individual, or attempting to flee arrest. (*Id.*) Defendants John Does 1-4 did not

issue a warning that pepper balls would be deployed or that Mr. Dayton, specifically, should cease engaging in any conduct or risk being shot with pepper balls. (*Id.* at ¶ 25.)

After being shot with pepper balls, Mr. Dayton sat down in pain to demonstrate that he was not being aggressive towards the DPD officers or to anyone else. (*Id.* at ¶ 26.) DPD officers again began advancing on the crowd and indiscriminately deploying KIPs without announcement or warning. (*Id.* at ¶ 27.) Seconds after DPD officers began advancing, one of Defendants John Does 1-4 threw a flash-bang grenade directly at Mr. Dayton, who was still sitting in the middle of the crowd. (*Id.* at ¶ 28.) The flash-bang grenade struck Mr. Dayton in his left elbow and then exploded, searing Mr. Dayton's eyes and causing him significant pain in his elbow. (*Id.*) Defendants John Does 1-4 did not issue a warning that a flash-bang grenade would be deployed, allow Mr. Dayton time to retreat from the grenade, or instruct Mr. Dayton where he needed to go to avoid being subject to the grenade. (*Id.* at ¶ 29.)

Mr. Dayton suffered damages, including enduring pain in his elbow. (*Id.* at ¶ 31.) He asserts that, for a while, he was limited in his ability to work in his occupation as an electrical engineer and had to work intermittent hours due to difficulty typing with his left arm. (*Id.* at ¶¶ 21, 31.) He was also unable to work his side business of electronics assembly as a result of his injuries and closed it the next year. (*Id.* at ¶ 31.)

On April 7, 2022, Mr. Dayton initiated this action against Defendants John Does 1-4, Pazen (Chief of DPD during the protests), Phelan (Incident Commander for the protests for DPD), and the city of Denver. In his Complaint (Doc. # 1), Mr. Dayton brings the following claims against all Defendants pursuant to 42 U.S.C. § 1983: (1) First

Amendment violation of freedom of speech and assembly; (2) First Amendment retaliation; (3) Fourth Amendment excessive force; (4) Fourteenth Amendment excessive force; and (5) Fourteenth Amendment due process.

Defendants Denver, Pazen, and Phelan filed the instant Motions to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 14, 2022. (Doc. ## 12, 13.) In addition to disputing the sufficiency of the allegations, Denver contends that the Complaint fails to plausibly state a claim of municipal liability, and Defendants Pazen and Phelan assert that they are entitled to qualified immunity. Mr. Dayton filed a combined Response on July 26, 2022 (Doc. # 24), and Defendants followed with a combined Reply on August 9, 2022 (Doc. # 29). In addition, Mr. Dayton has filed three separate notices of supplemental authority. (Doc. ## 38, 42, 43.) The matter is now ripe for review.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of [a] plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir. 1998). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and brackets omitted).

### III.   DISCUSSION

### A.   CONSIDERATION OF MATERIAL OUTSIDE THE PLEADINGS

Generally, a court may consider only the contents of the complaint when ruling on a Rule 12(b)(6) motion. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The Tenth Circuit has noted that there are exceptions to this rule, but they are "quite limited." *Id.* First, the court may consider documents incorporated by reference into the complaint or attached to the complaint, such as exhibits. *Id.* Second, the court may consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)); *see GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a

plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). The third exception is "matters of which the court may take judicial notice." *Gee*, 627 F.3d at 1186 (quoting *Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). These include "[the court's] own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001). However, these documents "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). If a court intends to rely on evidence outside the scope of these exceptions, "it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties." *Gee*, 627 F.3d at 1186. The failure to convert a 12(b)(6) motion to one for summary judgment is reversible error unless the dismissal can be justified without considering the outside materials. *See GFF Corp.*, 130 F.3d at 1384.

Defendants ask the Court to consider a video of the protest, via a YouTube link, "as a document referenced in the Complaint and central to Mr. Dayton's claims." (Doc. # 12 at 3 n.1.) Defendants argue that Mr. Dayton's Complaint includes still images from the video, which was captured by 9news.com via helicopter and is approximately 2 hours and 19 minutes long. (*Id.*) According to Defendants, the video directly contradicts Mr. Dayton's allegations that the protests were peaceful, non-violent, and not in violation

of any laws. (Doc. # 29 at 2.) Further, Defendants ask the Court to take judicial notice of the time of sunset on May 31, 2020, and of an Emergency Curfew order, which Defendant Denver attached as an exhibit to its Motion. (Doc. # 12 at 3 n.1.) Defendants assert that all the protesters were in violation of an 8:00 p.m. curfew and that the Court could determine as such by considering the video, the time of sunset, and the copy of the Emergency Curfew order. (*Id.*)

The Court acknowledges that the Complaint includes three still images that appear to be overhead shots of the protests. *See* (Doc. # 1 at 8–10.) However, the Court disagrees with Defendants that the video that these images come from is "referred to" and "central" to Mr. Dayton's claims such that it would be appropriate for the Court to consider over two hours of helicopter video footage of Denver on the evening of May 31, 2020. Indeed, the three still images are the only "references" to any video footage at all—nowhere in Mr. Dayton's Complaint does he indicate that video footage is integral or central to any of his claims. *Cf. Jackson v. Gatto*, No. 13-cv-02516-CBS, 2014 WL 2743130, at *3 (D. Colo. June 17, 2014) (reviewing an audio/video recording offered by defendant for a 12(b)(6) motion where neither side disputed its authenticity and the recording was referenced in plaintiff's allegations and central to her claims). In the absence of any further reference to or reliance on video footage in the Complaint, the Court finds that it would be improper to consider the video at this stage.

Further, the Tenth Circuit has stated that when reviewing video footage for a 12(b)(6) motion, the Court must accept as true a plaintiff's allegations unless the video evidence "blatantly contradicts" those allegations. *Estate of Ronquillo v. City & Cnty. of*

*Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (unpublished) (quoting *Thomas v. Durastanti*, 607 F.3d 655, 672 (10th Cir. 2010)). Defendants point out that the stills are from approximately 1:24:22 to 1:24:43 in the video. (Doc. # 12 at 3 n.1.) The Court is satisfied that the portion of the video from which the stills were taken does not blatantly contradict the allegations in Mr. Dayton's Complaint. The Court therefore exercises its discretion to decline to consider the full video for purposes of evaluating the Motions to Dismiss. *See Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (holding that if a defendant attaches to a 12(b)(6) motion materials referred to by the plaintiff and central to his claim, the court has discretion to consider or decline to consider such materials).

Likewise, the Court will not consider the Emergency Curfew order attached to Defendant Denver's Motion to Dismiss. Although Defendants assert that the Court may take judicial notice of the Emergency Curfew order as a public record, the Court disagrees that doing so would be appropriate at this stage. Significantly, evidence that a court takes judicial notice of may not be used "to prove the truth of matters asserted therein." *Tal*, 453 F.3d at 1264 n.24. Because the parties appear to dispute the relevant time of day and whether the protestors were in violation of curfew, the Court finds that it would be inappropriate to take judicial notice of this extrinsic evidence for purposes of evaluating the sufficiency of the Complaint.[1] Defendants' arguments challenging the

---

[1] Defendants urge the Court to find that Mr. Dayton's allegations regarding the lawfulness of the protesters' conduct are not entitled to the presumption of truth because the protesters were all in violation of curfew. Even if the Court were to find, at this stage of the proceedings, that Mr. Dayton's "lawful conduct" allegations are clearly contradicted by the curfew order, this single discrepancy would not warrant dismissal of all of Mr. Dayton's claims. A curfew alone does not erase an individual's rights to freedom of speech and to be free from use of excessive force. *See Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969) ("Petitioners' march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment."); *Davis v.*

veracity of Mr. Dayton's allegations are better suited for the disputed evidence standard under Federal Rule of Civil Procedure 56, as opposed to the plausibility pleading standard that governs Rule 12(b)(6) motions to dismiss.

**B.   CONSTITUTIONAL CLAIMS**

Next, Defendants argue that Mr. Dayton's allegations are insufficient to state his constitutional claims pursuant to Rule 12(b)(6). The Court will address the sufficiency of the allegations for each of Mr. Dayton's claims in turn.

1.   <u>First Amendment Freedom of Speech and Assembly</u>

"[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). As such, courts must "scrutinize carefully any restrictions on public issue picketing." *McCutcheon*, 572 U.S. at 203. Further, the Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)).

In the instant case, Mr. Dayton alleges that Defendants' actions constituted content-based and/or viewpoint-based restriction of his and the other protesters' expression and assembly to protest police brutality. (Doc. # 1 at ¶¶ 142, 147.) A

---

*Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016) ("Although an officer can effect an arrest for even a minor infraction, a minor offense—at most—supports the use of minimal force." (alterations adopted) (quoting *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016))).

government "has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The Supreme Court has held that the "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based speech restrictions must satisfy strict scrutiny, meaning they must be "narrowly tailored to serve a compelling government interest." *Verlo v. Martinez*, 820 F.3d 1113, 1134 (10th Cir. 2016).

The Court finds that the allegations in the Complaint are sufficient to state a claim that Defendants violated Mr. Dayton's First Amendment rights by impermissibly restricting his speech based on the content of that speech. Mr. Dayton alleges that he and other protesters were on a public street and that the purpose of their protest was to express concern about police brutality. (Doc. # 1 at ¶¶ 23–24); *see United States v. Grace*, 461 U.S. 171, 177 (1983) (observing that "streets, sidewalks, and parks" are considered to be "public forums" where "the government's ability to permissibly restrict expressive conduct is very limited"). Further, the Complaint alleges that Denver invoked the Mutual Aid Statute and controlled an increased police presence from other agencies in the Denver Metro Area, that Defendants adopted a policy or practice of authorizing officers to indiscriminately fire KIPs into the crowd of protesters, and that officers routinely aggressively advanced on protestors while using excessive force. (Doc. # 1 at ¶¶ 23–24, 143–48.)  These are several actions by Defendants that a reasonable fact finder could infer to be content-based discrimination against speech, particularly if

considered along with allegations that the protesters were peaceful and there was no aggression toward officers. *See Minter v. City of Aurora, Colo.*, No. 20-cv-02172-RMR-NYW, 2022 WL 900158, at *6 (D. Colo. Mar. 28, 2022) (finding it reasonable to infer that defendants "based their decision to declare the assembly unlawful, to enforce that order, and to use physical force, because of the speaker and/ or content of the speech at issue").

Similarly, the Court finds that the Complaint sufficiently alleges that Defendants' actions were not narrowly tailored to further a legitimate government interest. Accepting as true Mr. Dayton's allegations that the protest was peaceful and non-violent, the Complaint plausibly alleges that Defendants' increased police presence, persistent use of projectiles, and advancement on the crowd was not narrowly tailed for a compelling government interest. *See Verlo*, 820 F.3d at 1134 ("[A] content-based restriction is narrowly tailored only if it is the least restrictive means of achieving the government's compelling objective.").

For these reasons, the Court finds that Mr. Dayton has plausibly alleged a claim for violation of his First Amendment rights to free speech and assembly.

2.     <u>First Amendment Retaliation</u>

To state a claim for retaliation under the First Amendment, a plaintiff must show (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally

protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212–13 (10th Cir. 2000). Defendants argue that the Complaint fails to adequately allege the third element, which requires a showing of "but-for cause," *i.e.*, "that the adverse action against the plaintiff would not have been taken absent a retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

The Court finds that the Complaint plausibly alleges a claim for First Amendment retaliation. Mr. Dayton alleges (1) he was engaged in constitutionally protected activity by protesting police brutality (Doc. # 1 at ¶ 23); (2) he suffered an injury by being hit with KIPs and a flash-bang grenade (*id.* at ¶¶ 24, 28), and such injury would chill a person of ordinary firmness from continuing to protest (*id.* at ¶¶ 164, 168); and (3) Defendants used excessive force, including firing KIPs and deploying chemical agents, to punish Mr. Dayton for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future (*id.* at ¶¶ 167–68). Taken as true, these allegations are sufficient for a reasonable fact finder to determine that Defendants retaliated against Mr. Dayton for his protected First Amendment activity.

3.    <u>Fourth Amendment Excessive Force</u>

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Excessive force claims under the Fourth Amendment are analyzed for objective reasonableness. *Id.* Determining the objective reasonableness of a seizure "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.*

(quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The Court must assess the officer's conduct "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgements" in situations "that are tense, uncertain, and rapidly involving." *Id.* at 396–97. Further, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" ("*Graham* factors"). *Id.* at 396.

The Supreme Court recently clarified that there are "seizures by **control** and seizures by **force**." *Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021). With respect to seizures by force, the Court held that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 1003. A seizure by force can be fleeting—it "lasts only as long as the application of force," absent submission. *Id.* at 999. Further, while the amount of force remains relevant in assessing the objective intent to restrain, "a mere touch can be enough for a seizure." *Id.* at 998. Applying these principles, the Supreme Court held that police officers ordering a suspect to stop and then shooting at her "satisfies the objective test for a seizure" because the officers "applied physical force to her body and objectively manifested an intent to restrain her from driving away." *Id.* at 999.

Guided by *Torres*, this Court finds that the Complaint plausibly alleges a Fourth Amendment excessive force claim. The allegations show that Defendants John Does 1-4 "began advancing on the crowd" and one of them "threw a flash-bang grenade directly

at Mr. Dayton, who was still sitting in the middle of the crowd." (Doc. # 1 at ¶¶ 27–28.)
The flash-bang grenade "struck Mr. Dayton directly in his left elbow" and "exploded,
searing Mr. Dayton's eyes." (*Id.* at ¶ 28.) The Complaint further alleges that flash-bang
grenades "are hand-thrown explosive devices that emit a bright flash and a loud noise"
and which "are designed to disorient" and "can cause temporary blindness and
deafness." (*Id.* at ¶ 125.) Applying the *Graham* factors, the Court finds that these
allegations are sufficient to show that Defendants unreasonably seized Mr. Dayton by
advancing on him and throwing a flash-bang grenade at him while he was peacefully
sitting on the ground. *See Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo.
2020) (finding that plaintiffs were likely to prevail on their Fourth Amendment excessive
force claim where "plaintiffs were attacked with rubber bullets, tear gas, etc. allegedly
solely on the basis of their presence at the demonstrations"). Stated differently,
Defendants' conduct "objectively manifested an intent" to restrain and incapacitate Mr.
Dayton while he was peacefully protesting. *Torres*, 141 S. Ct. at 999. As such, the
Complaint plausibly states a Fourth Amendment claim.

    4.   <u>Fourteenth Amendment Excessive Force</u>

       Defendants argue that Mr. Dayton's Fourteenth Amendment excessive force
claim must be dismissed because in situations where, as here, the claim is premised on
a pre-arrest seizure, the claim should instead be analyzed under the Fourth
Amendment. (Doc. # 12 at 10); *see Huff v. Reeves*, 996 F.3d 1082, 1092 (10th Cir.
2021) (observing that where an excessive-force claim alleges a prearrest seizure, it is
properly analyzed under the Fourth Amendment). Mr. Dayton appears to agree with this

precedent and concedes the claim. (Doc. # 24 at 26 n.6). Accordingly, the Court grants Defendants' Motions to Dismiss with respect to the Fourteenth Amendment excessive force claim and dismisses that claim.

      5.    <u>Fourteenth Amendment Due Process</u>

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Accordingly, a law or policy may be invalidated if it is "impermissibly vague." *Id.* The Supreme Court has held that the "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly;" and second, that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* In other words, an enactment "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). In situations concerning speech, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 253–54.

Defendants argue that the Complaint fails to identify with specificity any orders issued by Defendants that violated Mr. Dayton's due process rights. (Doc. # 12 at 10–11.) However, the Court finds that the Complaint includes several allegations that could support a due process claim on the basis of unconstitutionally vague orders or policies. These include allegations that DPD officers "customarily used flash-bang grenades

against peaceful protesters" and did so without announcement or warning when advancing on protesters to disperse them. (Doc. # 1 at ¶¶ 28–29, 124–30.) Further, the Complaint alleges that Denver's policymakers and supervisors (including Pazen and Phelan) gave authority to DPD officers to use KIPs, including pepper balls, to shoot peaceful protesters without warning in the head, neck, and chest in order to suppress and control the protests. (*Id.* at ¶¶ 131–33.) The Complaint thus adequately alleges that Defendants had a policy of giving officers discretion to use flash-bang grenades and KIPs against protesters without warning or first giving dispersal orders. This kind of policy that furnishes discretion to officers "encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do" in order to avoid being subject to use of force. *Kolender v. Lawson*, 461 U.S. 352, 361 (1983). The Court therefore finds that Mr. Dayton has adequately alleged that Defendants violated his due process rights by having a custom or policy of permitting officers to use force against protesters to disperse them without first providing sufficient notice or opportunity to comply. *See Ahmad v. City of St. Louis*, No. 4:17 CV 2455 CPD, 2017 WL 5478410, at *15 (E.D. Mo. Nov. 15, 2017). Such a policy or custom violates due process by affording "too much discretion to the police and too little notice to citizens who wish to use the public streets." *Morales*, 527 U.S. at 64.

## C.   QUALIFIED IMMUNITY

Next, the Court will address Defendants Pazen and Phelan's arguments that they are entitled to qualified immunity. (Doc. # 13 at 3.)

The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). To overcome the defense of qualified immunity, a plaintiff must present enough facts in the complaint, taken as true, to show (1) a violation of a constitutional or statutory right and (2) that the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The bar is higher for Defendants Pazen and Phelan because they assert a qualified immunity defense in a Rule 12(b)(6) motion instead of a Rule 56 motion. *See Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) ("Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment."). In the 12(b)(6) context, a district court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotation marks omitted).

    1.   <u>Supervisory Liability / Violation of a Constitutional Right</u>

For reasons stated above, the Court finds that the Complaint plausibly alleges violations of Mr. Dayton's rights under the First, Fourth, and Fourteenth Amendments. However, Defendants dispute whether the Complaint adequately alleges supervisory liability as to Pazen and Phelan.

Pursuant to § 1983, "government officials are not vicariously liable for the misconduct of their subordinates." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Rather, to assert a claim on the basis of supervisory liability, a plaintiff must plausibly allege "an 'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Id.* (quoting *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001)). Liability may not be based upon "mere negligence"—the plaintiff "must establish that the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)).

Upon carefully reviewing the Complaint, the Court finds that the allegations are sufficient to support Mr. Dayton's claims on the basis of supervisory liability against Defendants Pazen and Phelan. The Complaint alleges that Defendant Pazen, as Chief of Police, and Defendant Phelan, as Incident Commander, were responsible for supervising Defendants John Does 1-4 and directing their actions during the protest on May 31, 2020. (Doc. # 1 at ¶¶ 7–8.) The Complaint further alleges that Pazen and Phelan each "authorized the use of KIPs and flash-bang grenades on protesters throughout the George Floyd protests and specifically the use of KIPs and flash-bang grenades against [Mr. Dayton] on May 31, 2020." (*Id.*) Defendants Pazen and Phelan "knowingly armed Defendants John Does 1-4 with flash-bang grenades despite knowing that Defendants John Does 1-4 had no training on flash-bang grenades and that there were no DPD policies and procedures governing when and how flash-bang grenades

could be deployed." (*Id.* at ¶ 130.) They also "approved, condoned, and ratified" DPD officers' use of KIPs, including pepper balls, against peaceful protestors and gave "specific authorization" to DPD officers "to shoot protesters in the head, face, and chest." (*Id.* at ¶¶ 123, 131–133.)

In addition, the Complaint alleges that on May 29, 2020 (two days before the events in this case), Defendant Pazen and Denver Mayor Michael Hancock held a press conference in which they "praised and explicitly condoned DPD officers' actions during the first two days of the George Floyd protests." (*Id.* at ¶ 86.) Because the officers' actions during the first two days allegedly included the same or similar "grossly excessive force" and retaliation against peaceful protesters, Mr. Dayton contends that Defendant Pazen's decision to condone those actions also "sent a message to Defendant John Does 1-4 that they were authorized to use excessive force and retaliate against Mr. Dayton" on May 31, 2020. (*Id.* at ¶ 88.)

Based on these factual allegations, the Court finds that Mr. Dayton has demonstrated an "affirmative link" between the constitutional deprivation and Defendants Pazen's and Phelan's personal participation, exercise of control or direction, and failure to supervise. *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008); *see Buck v. City of Albuquerque*, 549 F.3d 1269, 1287 (10th Cir. 2008) (concluding that an incident commander supervising a police response to a demonstration may be personally liable under a supervisory liability theory for violations of protesters' constitutional rights caused by officers). The Complaint plausibly alleges that Defendants Pazen and Phelan "set in motion a series of events" that "they knew or

reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Buck*, 549 F.3d at 1279–80 (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). The Court therefore rejects Defendants Pazen and Phelan's argument with respect to supervisory liability.

2.   Clearly Established

To show that a right was clearly established, "the plaintiff must point to 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Callahan v. Unified Gov. of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014)). An officer's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

For reasons described in detail above, the Court finds that Mr. Dayton has carried his burden of showing that the law was clearly established that Defendants' actions, as alleged, violated his rights under the First, Fourth, and Fourteenth Amendments. Specifically, it is clearly established that government officials may not impose restrictions or retaliate against individuals based on the content of their speech or their decision to engage in peaceful protest. *See Jones*, 465 F.3d at 56 (observing that the Supreme Court "has repeatedly held that police may not interfere with orderly nonviolent protests merely because they disagree with the content of the speech or

because they simply fear possible disorder" (citing *Cox*, 379 U.S. at 550)). The Tenth

Circuit has further made clear that police officers may not use unreasonable force

against individuals who are not committing any crimes, posing an immediate threat to

officer or public safety, or actively resisting arrest. *See, e.g.*, *Davis v. Clifford*, 825 F.3d

1131, 1135 (10th Cir. 2016) ("Although an officer can effect an arrest for even a minor

infraction, a minor offense—at most—supports the use of minimal force." (alterations

adopted) (quoting *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016))); *see also*

*Torres*, 141 S. Ct. at 998–1001. Finally, it is clearly established that a policy violates due

process where "it fails to establish standards for the police and public that are sufficient

to guard against the arbitrary deprivation of liberty interests." *Morales*, 527 U.S. at 52;

*see also Kolender*, 461 U.S. at 361. For these reasons, the Court finds that Defendants

Pazen and Phelan are not entitled to qualified immunity at this stage of the proceedings.

## D.   MUNICIPAL LIABILITY

Finally, the Court will address Denver's argument that the Complaint fails to

plausibly allege factual allegations to support a claim for municipal liability.

To state a claim for municipal liability under § 1983, a plaintiff must allege facts

which, if true, would establish "(1) that a municipal employee committed a constitutional

violation, and (2) that a municipal policy or custom was the moving force behind the

constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313,

1316 (10th Cir. 1998) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694

(1978)). A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom
> amoun[ting] to a widespread practice that, although not authorized by

21

> written law or express municipal policy, is so permanent and well settled
> as to constitute a custom or usage with the force of law; (3) the decisions
> of employees with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions—and the basis for them—of
> subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train or
> supervise employees, so long as that failure results from 'deliberate
> indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation

marks and citations omitted).

Based on the Court's findings above, the first element of the municipal liability

claim is met: The Complaint plausibly alleges that municipal employees, including

Defendants John Does 1-4, Pazen, and Phelan, violated Mr. Dayton's constitutional

rights. With respect to the second element, Mr. Dayton asserts that he has plausibly

pled that (1) Denver has multiple unconstitutional customs and practices that caused

the violation of his rights, and (2) Denver's failure to supervise and discipline its officers

caused the violation of his rights. (Doc. # 24 at 34.) Mr. Dayton must plead facts

sufficient to establish only one of these theories of liability for his municipal liability claim

to proceed. Accordingly, the Court will primarily focus its analysis on the allegedly

unconstitutional customs or practices.

To establish municipal liability on the basis of a custom or practice, a plaintiff

must show: (1) the existence of a continuing, persistent, and widespread practice of

unconstitutional misconduct by the municipality's employees; (2) deliberate indifference

to or tacit approval of such misconduct by the municipality's policymaking officials after

notice to the officials of that particular misconduct; and (3) that the plaintiff was injured

by virtue of the unconstitutional acts pursuant to the custom and that custom was the

moving force behind the unconstitutional acts. *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).

The Court finds that the Complaint adequately alleges the existence of a continuous, persistent, and widespread practice of unconstitutional misconduct by DPD officers of deploying KIPs and flash-bang grenades at peaceful protesters without warning. (Doc. # 1 at ¶¶ 66, 68, 74, 85). Along with the allegations describing this use of force against Mr. Dayton, the Complaint identifies over 20 specific examples of DPD officers shooting KIPs at peaceful protestors and other non-threatening individuals on each day of the protests from May 28, 2020, to June 2, 2020.[2] (*Id.* at ¶¶ 36, 40, 45, 47–48, 50–52, 54–55, 57–61, 63–85.) Taken as true, these allegations are sufficient to demonstrate a persistent, widespread custom or practice within DPD of indiscriminately firing KIPs without warning to disperse, control, or suppress peaceful protests. Further, the Court finds that the allegations are sufficient to infer that Denver had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). In addition to the allegations spanning several days of protests in late May and early June 2020, the

---

[2] The Complaint also alleges that DPD officers fired KIPs at and hit members of the press (Doc. # 1 at ¶¶ 37, 41–42, 53, 56), individuals acting as medics (*id.* at ¶¶ 36, 38, 44, 50), and individuals unaffiliated with the protest who were walking nearby (*id.* at ¶ 46).

Complaint alleges that DPD officers had previously responded to a peaceful protest by indiscriminately shooting protestors with KIPS, including pepper balls, in October 2011. (Doc. # 1 at ¶ 33.) Mr. Dayton thus plausibly alleges that he was injured by Denver's custom or practice of permitting officers to fire KIPs at peaceful protestors and that Denver's policymakers had notice of this unconstitutional use of force.

Lastly, the Court also notes that Mr. Dayton sufficiently pleads a claim for municipal liability on the theory of failure to supervise. The Complaint alleges that (1) DPD officers exceeded constitutional limitations on use of force by firing KIPs at peaceful protestors; (2) the violation "arose under circumstances"—a protest—"that constitute a usual and recurring situation with which police officers must deal"; (3) the inadequate supervision constituted deliberate indifference against individuals peacefully protesting police brutality; and (4) there is a direct causal link between the constitutional deprivation and inadequate supervision and discipline. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 841–42 (10th Cir. 1997). Accordingly, the Court finds that the Complaint adequately states a claim for municipal liability.

## IV.   CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

- Defendant Denver's Motion to Dismiss (Doc. # 12) and Defendants Pazen and Phelan's Motion to Dismiss (Doc. # 13) are GRANTED IN PART and DENIED IN PART. The Motions are GRANTED IN PART with respect to Plaintiff's fourth claim for excessive force under the Fourteenth Amendment. The Motions are DENIED in all other respects.

- Accordingly, Plaintiff's fourth claim for Fourteenth Amendment excessive force is DISMISSED.

DATED:  January 5, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge